686 N.W.2d 241 (2004)
262 Mich.App. 274
Penny RYMAL, Plaintiff,
v.
Herman BAERGEN and MTD Systems, Inc., Defendants-Appellees, and
Clark Products, Inc., and Clark Foodservice, Inc., Defendants-Appellants.
Penny Rymal, Plaintiff-Appellant,
v.
Herman Baergen and MTD Systems, Inc., Defendants-Appellees, and
Clark Products, Inc., and Clark Foodservice, Inc., Defendants.
Docket Nos. 243795, 248124.
Court of Appeals of Michigan.
Submitted March 9, 2004, at Detroit.
Decided June 8, 2004, at 9:05 a.m.
Released for Publication August 18, 2004.
*245 Mazur, Morgan, Meyers & Kittel, PLLC (by Linda M. Galante and Courtney E. Morgan, Jr.), Dearborn, for Penny Rymal.
Vercruysse, Murray & Calzone, P.C. (by Daniel J. Bernard and Susan Hartmus Hiser), Franklin, for Herman Baergen and MTD Systems, Inc.
Butzel Long, P.C. (by Marcia L. Proctor) and Kienbaum, Opperwall, Hardy & Pelton, P.L.C. (by Elizabeth Hardy and Robert Bruce Brown), Detroit, Birmingham, for Clark Products, Inc., and Clark Foodservice, Inc.
Before: KELLY, P.J., and MURPHY and NEFF, JJ.
MURPHY, J.
In Docket No. 248124, plaintiff appeals as of right the trial court's order granting summary disposition in favor of defendants Herman Baergen and MTD Systems, Inc., with respect to plaintiff's claims of sexual harassment and retaliation in the workplace brought pursuant to the Civil Rights Act (CRA), MCL 37.2101 et seq.[1]In Docket No. 243795, defendants Clark Products, Inc., and Clark Foodservice, Inc., (hereinafter collectively referred to as Clark) appeal by leave granted an order disqualifying Clark's counsel for a conflict of interest. Because there exists genuine issues of material fact in regard to all of plaintiff's claims against defendants Baergen and MTD, and because Baergen can be held individually liable solely for the retaliation claim in spite of this Court's decision in Jager v. Nationwide Truck Brokers, Inc., 252 Mich.App. 464, 652 N.W.2d 503 (2002), we affirm in part and reverse in part the grant of summary disposition in Docket No. 248124 and remand for further proceedings. Because there was a lack of evidence showing a conflict of interest or improper use of confidential information requiring disqualification, and because Baergen expressly consented to counsel's continued participation should a conflict be discovered, we reverse the order disqualifying Clark's counsel in Docket No. 243795.

I. FACTUAL ALLEGATIONS and PROCEDURAL HISTORY

A. Plaintiff's Complaint
On July 26, 2001, plaintiff filed a two-count complaint against all defendants. The complaint alleged that plaintiff commenced her employment with Clark in 1983 as an accounts receivable manager. She later became an office manager, assistant division manager, acting division manager, and subsequently, in 1993, a sales manager. Baergen was an employee-supervisor of Clark having authority over plaintiff. During plaintiff's and Baergen's tenure with Clark, they formed MTD Systems, which plaintiff refers to as her employer, *246 along with Clark. MTD is in the business of picking up movies from distribution points and delivering the movies to various theaters.
Plaintiff alleged that in October 1999, Baergen propositioned plaintiff to have a sexual relationship, and she declined. Shortly thereafter, Baergen asked plaintiff to sign a noncompete agreement that would reflect a promise not to engage in any business that was competitive with Clark. Plaintiff alleged that the request was an act of harassment and was made because of plaintiff's refusal to comply with Baergen's sexual advances. Plaintiff did not sign the noncompete agreement.
Further, plaintiff averred that, beginning in November 1999, Baergen started reassigning plaintiff's duties to other persons. These duties included creation of advertisements, approval of vacation requests, and assignment of new account leads to sales people. Additionally, plaintiff alleged that Baergen removed her as liaison to several customers, thereby interfering with sales commissions, questioned her about her work hours, and pressured plaintiff to relinquish her management position. Moreover, Baergen became verbally abusive and once became so enraged, because he thought plaintiff was on the phone too long, that he punched a wall in plaintiff's office, requiring him to seek medical attention. Plaintiff averred that Baergen started accusing her of having sexual relations with customers to obtain their business, and that she spent her lunch hours having sex with various men.
The complaint alleged that in January 2000, plaintiff demanded a sales review and a formal description of her job duties and responsibilities in response to a complaint that she was inadequately performing, but Baergen refused. It was asserted that plaintiff contacted a Clark executive about her ongoing problems with Baergen and that the executive promised to, but did not, meet with plaintiff. After this failed attempt by plaintiff to rectify the situation, Baergen refused to pay an expense voucher for plaintiff and removed her expense account entirely. Her duties were lowered to those of an administrator. Plaintiff additionally averred that the claimed reasons for these actions were that, on March 1, 2000, she had been demoted to a sales person. In July 2000, Baergen informed plaintiff that the sales manager job was given to a male. Plaintiff alleged that she left her employment on July 27, 2000, as she had been constructively discharged. We note that with respect to the alleged retaliatory actions, discriminatory practices, and other events, plaintiff's complaint does not distinguish whether the actions were in the context of her employment with Clark or MTD Systems.
Count I of the complaint, which is fairly cursory, asserted a cause of action predicated on the CRA. The count provided, in relevant part:
22. Plaintiff was sexually harassed and retaliated against by defendants' agent and employee, Defendant Baergen, throughout the course of her employment.
23. This sexual harassment and retaliation included, but is not limited to, unwelcome comments and conduct of an offensive and sexual nature directed at plaintiff, the creation of a hostile work environment, as described herein[,] and constructively terminating plaintiff's employment and withholding pay commissions due to her, based on her refusal to engage in a sexual relationship ....
Count II of the complaint alleged violations of the SRCA for outstanding sales commissions due and owed plaintiff by Clark and MTD.

*247 B. Proceedings Concerning Attorney Disqualification
Before Baergen and MTD filed an answer to the complaint, and fast approaching the deadline for answering, the law firm serving as counsel for Clark contacted Baergen and asked him whether he wished for Clark's counsel to file an answer on his and MTD's behalf with the understanding that the appearance would initially be limited to filing an answer and affirmative defenses. Counsel also informed Baergen that continued representation would be conditioned on an opportunity to determine to its satisfaction that no conflict of interest existed between Clark and Baergen and MTD. Counsel also indicated that while there did not initially appear to be a conflict, if a conflict were revealed through discovery, counsel for Clark would have to cease representation of Baergen and MTD. Counsel required that Baergen agree that if a conflict were discovered, counsel could continue to represent Clark notwithstanding that Baergen may have shared information subject to the attorney-client privilege. Baergen signed a letter setting forth all of the conditions noted above, acknowledging acceptance of the law firm's representation under the terms described. Clark's counsel then filed an answer and affirmative defenses on behalf of Baergen and MTD in late August 2001.
A few days later, in early September 2001, Clark's CEO met with Baergen and counsel law firm, and during a discussion of the nature of MTD's business and Baergen's and plaintiff's involvement with the business, it was determined that a conflict of interest existed. Baergen was excused from the meeting, and after it had concluded counsel informed him that the law firm was withdrawing representation of Baergen and MTD. Baergen obtained new counsel for himself and MTD, and an order for substitution of counsel was entered on October 10, 2001. In December 2001, Clark terminated Baergen's employment on the basis of Baergen's involvement with MTD.
In July 2002, after the conclusion of plaintiff's and Baergen's depositions, Clark filed a motion for leave to add a counterclaim against plaintiff and a cross-claim against Baergen and MTD. The proposed claims related to Baergen and MTD, which closely mimicked the proposed claims against plaintiff, included breach of implied contract, breach of fiduciary duty, usurpation of corporate business opportunity, tortious interference with business relations or reasonable business expectations, silent fraud, and civil conspiracy. These causes of action were predicated on allegations that, in 1989, Baergen was approached about the film distribution idea while he was working in his capacity as a manager for Clark, that Baergen did not tell Clark superiors about the opportunity, that Baergen, without authority, declined the opportunity on behalf of Clark, and that Baergen thereafter, acting in concert with plaintiff, took advantage of the opportunity and formed and began operating MTD to distribute films. Clark alleged that in 1990, Baergen registered MTD as a Michigan corporation. Clark further averred that Baergen and plaintiff, at times, used "on the clock" employees of Clark to conduct MTD business without corporate approval from Clark and utilized Clark's petty cash fund in operating MTD. Clark was adamant that the allegations supporting the proposed cross-claim arose through knowledge solely derived from the depositions of plaintiff and Baergen, which occurred after counsel terminated representation of Baergen and MTD. Leave to amend to add a counterclaim and cross-claim was denied by the trial court on grounds of untimeliness.
*248 Baergen and MTD filed a motion to disqualify Clark's counsel from further representing Clark, arguing that continued representation constituted a conflict of interest. A short evidentiary hearing was conducted on the motion for disqualification. The director of administration and general counsel for Clark testified that Clark wished to retain present counsel because counsel was most familiar with the action and obtaining new counsel would place Clark at a disadvantage in that new counsel would have to be advised of prior developments, causing delays and a great deal of extra expenses. On cross-examination, general counsel stated that he played no role whatsoever with respect to the retention agreement between Clark's litigation counsel and Baergen, and that Clark never obtained Baergen's consent to Clark actually taking adverse action against Baergen and MTD.
Baergen testified that he was the sole shareholder of MTD, and that he indeed signed a retainer agreement with Clark's counsel. Baergen asserted that counsel never indicated an intent that an adverse action would be taken against Baergen, that he never consented to allow counsel to take an adverse action against him, that he never consented to counsel's representation of Clark in a manner adverse to Baergen, that he did not now consent to counsel's continued representation of Clark, and that he did not and does not waive a conflict of interest. Baergen stated that he had never met Clark's general counsel. On cross-examination, Baergen acknowledged the meeting in early September 2001 with Clark's CEO and counsel, and that, shortly into the meeting, the CEO stated, "that's a smoking gun," after which Baergen was asked to leave the room and subsequently told that he had to obtain his own attorney. An affidavit by Baergen that was submitted with the motion to disqualify provided that he had confidential discussions with Clark's counsel in preparation for filing the answer, along with subsequent confidential discussions, all related to giving counsel background on himself, MTD, and the allegations in the lawsuit.
The trial court found a conflict of interest existed and that Clark's counsel attempted to take an adverse action against Baergen and MTD. The order entered by the trial court provided that "the motion to disqualify Clark's counsel is granted, and Clark's counsel is disqualified from further representation of the Clark defendants in this matter and from representing any party in any matter where such party is adverse in any way to Herman Baergen and/or MTD System Inc."
This Court granted Clark's application for leave to appeal the disqualification order, limited to the issues raised in the application. Rymal v. Baergen, unpublished order of the Court of Appeals, entered March 25, 2003 (Docket No. 243795). A motion for summary disposition filed by Clark was denied by the trial court, and on April 2, 2003, an order was entered by the trial court granting plaintiff's motion for an order approving settlement and for the entry of judgment. The order reflects that plaintiff and Clark settled the lawsuit for $200,000.

C. Summary Disposition
Defendants Baergen and MTD (hereinafter defendants) filed a motion for summary disposition pursuant to MCR 2.116(C)(8) and (10). Defendants first argued that Baergen had no liability under the CRA because, citing Jager, supra, the CRA does not provide for individual, supervisor liability. Defendants further argued that there was no MTD work environment, let alone a hostile work environment, and that plaintiff's allegations related solely to her employment with *249 Clark. This argument was made by defendants in reliance on plaintiff's deposition testimony that her work for MTD, which involved general clerical work, including billing, making bank deposits, and paying bills, was done on evenings and Saturdays, totaled about twelve to fifteen hours a week, and was done from her home. The remainder of defendants' argument pertained to the SRCA claim.
Oral argument was presented to the trial court on the motion for summary disposition, and the court took the matter under advisement, subsequently issuing a written opinion. After reviewing the factual background of the case and presenting an overview, the trial court next stated that "[w]hile perhaps unartfully worded, plaintiff's allegations are sufficient to put defendant MTD on notice of claims of retaliation, hostile work environment, and quid pro quo sexual harassment." Regarding the claim of retaliation, the trial court ruled that plaintiff had not established that her participation in protected activity, rejection of Baergen's sexual advances, and complaint to the Clark executive were significant factors in MTD's employment actions. The trial court further stated:
Although plaintiff claims defendant Baergen's behavior toward her at defendants Clark changed after her rejection of his proposition, she testified she left the dinner [where the proposition was made] and proceeded to a regular distribution meeting for defendant MTD that defendant Baergen also attended without incident. Despite the allegations of ongoing problems with defendant Baergen at defendants Clark, the record does not suggest plaintiff had any problems with defendant Baergen at defendant MTD until April 2000 (some six months later) when he took over the bookkeeping duties for defendant MTD. However, plaintiff's remaining duties with defendant MTD were not apparently affected.
While perhaps suggestive of a possible causal connection, the remoteness in time of the single incident related to defendant MTD does not establish plaintiff's presumed protected activities were a significant factor in defendant MTD's reduction of her duties. Moreover, plaintiff continued working for defendant MTD for another three months before ceasing her functions therewith, suggesting defendant MTD's actions were not so adverse or severe that plaintiff would have felt compelled to resign her duties.
With respect to the claims of a hostile work environment and quid pro quo harassment, the trial court first noted that the apparent lack of a physical workplace did not preclude an action for hostile work environment. The trial court then proceeded to conclude that "plaintiff has failed to proffer evidence suggesting her October 14, 1999 refusal of defendant Baergen's proposition either was a factor in defendant MTD's reduction of her duties in April 2000 or created an intimidating, hostile or offensive work environment with defendant MTD."
Plaintiff filed a motion for reconsideration, arguing that the trial court committed palpable error in finding that no adverse consequences of plaintiff's rejection of Baergen's sexual advances occurred until April 2000 because deposition testimony showed that duties and pay were negatively affected in 1999. Plaintiff further argued that palpable error was committed where the trial court ignored plaintiff's claims of Baergen's repeated harassment and verbal abuse, as noted by the court in its opinion denying Clark's motion for summary disposition, which pertained to Baergen as a supervisor for both Clark and MTD. Additionally, plaintiff asserted that the trial court committed palpable *250 error by dismissing the retaliation claim against Baergen because the court's opinion did not even address the issue; it only addressed the retaliation claim against MTD, and Jager, supra, did not preclude individual liability for retaliation claims.
The trial court issued a written opinion and order denying the motion for reconsideration. The trial court ruled that "[w]hile defendant Baergen may have been wearing two hats, the evidence only suggests that he acted wrongly while wearing ... Clark's hat." The trial court found that there was no evidence that any of the heated exchanges between plaintiff and Baergen while on Clark's time and premises involved MTD business. The court stated that MTD was dismissed "for a failure of proof that plaintiff was subjected to harassment by defendant Baergen with respect to her job duties and conditions with defendant MTD." In regard to plaintiff's apparent reduction in pay and duties, the trial court pointed to evidence that two other MTD employees were treated similarly, thus "plaintiff has not established her rejection of defendant Baergen's proposition was a significant factor in her reduction in pay and duties." Accordingly, the court found a lack of the necessary causal connection between the protected activity and any retaliatory acts. Finally, the trial court ruled that Jager, supra, precluded all claims of individual liability against Baergen under the CRA.

II. ANALYSIS

INTRODUCTION
Plaintiff challenges summary dismissal of her CRA claims in Docket No. 248124 on grounds that genuine issues of material fact exist and that the CRA does not preclude individual liability. Clark challenges the order disqualifying counsel from any participation in proceedings against Baergen and MTD in Docket No. 243795.

DOCKET NO. 248124

A. Standard of Review
This Court reviews de novo a trial court's decision on a motion for summary disposition. Koenig v. South Haven, 460 Mich. 667, 674, 597 N.W.2d 99 (1999). Construction or interpretation of the CRA presents an issue of law that is also reviewed de novo. Haynie v. Dep't of State Police, 468 Mich. 302, 306, 664 N.W.2d 129 (2003).

B. Individual Liability of Defendant Baergen
Plaintiff raises three separate arguments on the matter of individual liability under the CRA. First, Baergen was liable because he was in fact plaintiff's employer as a sole proprietor. Second, assuming that Baergen was not plaintiff's employer, this Court's decision in Jager, supra, was legally incorrect and unsound. Third, with respect to the retaliation claim, Jager is inapposite because the CRA makes "persons," not just employers, liable for such claims if established.
Plaintiff's complaint asserted CRA violations sounding in sexual harassment (quid pro quo harassment and hostile environment harassment) and retaliation. In Chambers v. Trettco, Inc., 463 Mich. 297, 309, 614 N.W.2d 910 (2000), our Supreme Court reviewed the principles underlying a sexual harassment lawsuit in the context of employment and stated:
Through the Civil Rights Act, Michigan law recognizes that, in employment, freedom from discrimination because of sex is a civil right. MCL 37.2102; MSA 3.548(102). Employers are prohibited from violating this right, MCL 37.2202; MSA 3.548(202), and discrimination because of sex includes sexual harassment, MCL 37.2103(i); MSA 3.548(103)(i).
MCL 37.2103(i) provides, in pertinent part:
Discrimination because of sex includes sexual harassment. Sexual *251 harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:
(i) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment ....
(ii) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment ....
(iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment... or creating an intimidating, hostile, or offensive employment ... environment.
The first two of these subsections have been commonly referred to as quid pro quo sexual harassment. Chambers, supra at 310, 614 N.W.2d 910. "Sexual harassment that falls into the third subsection is commonly labeled hostile environment harassment." Id. (citation omitted).
With respect to the retaliation claim, MCL 37.2701(a) of the CRA provides, in relevant part, that a person shall not "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act."
The trial court ruled that Jager, in which this Court held "that the CRA provides solely for employer liability," id. at 485, 652 N.W.2d 503, precluded any claim of individual liability under the CRA.
We note that in Elezovic v. Ford Motor Co., 259 Mich.App. 187, 202, 673 N.W.2d 776 (2003), this Court concluded that "under the controlling legal principles regarding sexual harassment under Michigan law, Chambers, supra at 313, 614 N.W.2d 910, the Legislature did not intend to preclude individual liability for sexual harassment." The Elezovic panel, however, recognized its obligation to abide by Jager under MCR 7.215(J)(1), and ruled accordingly. The judges of this Court were polled, pursuant to MCR 7.215(J), and rejected the convening of a special panel to resolve any conflict between Jager and Elezovic.[2]Elezovic v. Ford Motor Co., 259 Mich.App. 801, 677 N.W.2d 378 (2003). Therefore, Jager remains controlling precedent.
Before we commence a substantive discussion of Jager, we reject plaintiff's argument that Baergen was the sole proprietor of MTD and, as such, he was both an employer and employee and thus can be held liable as an employer under the CRA. The record reflects that MTD is a Michigan corporation. Baergen testified in his deposition that he was the sole shareholder in MTD, a subchapter S corporation. Plaintiff testified in her deposition that she was a twenty-five percent owner of MTD and an employee, but she conceded that there was no written documentation showing her ownership. Plaintiff asserted that no MTD stock was ever issued; however, she made no claim that MTD was not a corporate entity, nor did she present evidence that MTD was not a recognized Michigan corporation. A corporation and sole proprietorship are two separate and distinct business entities. See Clark v. United Technologies Automotive, Inc., 459 Mich. 681, 693, 594 N.W.2d 447 (1999). Under MCL 37.2201(a) of the CRA, an "employer" is defined as a "person" *252 with one or more employees, and a "person" is defined as including a corporation, MCL 37.2103(g). The law treats a corporation as an entirely separate entity from its shareholders, even where one individual owns all the corporation's stock. Foodland Distributors v. Al-Naimi, 220 Mich.App. 453, 456, 559 N.W.2d 379 (1996); Kline v. Kline, 104 Mich.App. 700, 702, 305 N.W.2d 297 (1981). Here, MTD was plaintiff's employer because the corporation had one or more employees, not Baergen. Moreover, a review of the complaint reveals specific allegations that Baergen was an agent and employee of MTD and that plaintiff was an employee of MTD, not Baergen. Additionally, tax documents indicate that MTD System, Inc., was plaintiff's employer.
Plaintiff fails to argue that MTD's corporate veil should be pierced, and the documentary evidence would not support a piercing, such that Baergen should be treated as the actual employer, assuming that the doctrine is even applicable in the context of the CRA. "The traditional basis for piercing the corporate veil has been to protect a corporation's creditors where there is a unity of interest of the stockholders and the corporation and where the stockholders have used the corporate structure in an attempt to avoid legal obligations." Foodland, supra at 456, 559 N.W.2d 379. In the case at bar, there was no evidence suggesting that Baergen was using the corporate structure in an attempt to avoid legal obligations.
For the corporate veil to be pierced, the corporate entity must be a mere instrumentality of another individual or entity. Id. at 457, 559 N.W.2d 379, quoting SCD Chemical Distributors, Inc. v. Medley, 203 Mich.App. 374, 381, 512 N.W.2d 86 (1994). Further, the corporate entity must have been used to commit a wrong or fraud. Id. Additionally, and finally, there must have been an unjust injury or loss to the plaintiff. Id. There is no single rule delineating when a corporate entity should be disregarded, and the facts are to be assessed in light of a corporation's economic justification to determine if the corporate form has been abused. Id. at 456-457, 512 N.W.2d 86.
In the case before us today, we find no evidence indicating that MTD was a sham corporation or a mere instrumentality of Baergen that he used to commit a wrong. Rather, it appears that MTD is a legitimate corporation and that plaintiff was at one time employed by MTD.
Turning to Jager, the plaintiff there worked for Nationwide Truck Brokers, Inc. (NTB), through an employee lease agreement, and she was supervised by James Wilkerson. Jager accused Wilkerson of making unwanted sexual advances and inappropriate touching. She filed suit against numerous defendants, including Wilkerson, alleging two counts of discrimination in violation of the CRA. The Jager panel stated that "[t]he only count at issue on appeal is plaintiff's claim of `sexual discrimination and harassment.'" Jager, supra at 469, 652 N.W.2d 503. The trial court granted NTB's and Wilkerson's motion for summary disposition pursuant to MCR 2.116(C)(10), finding that, in regard to the quid pro quo theory of sexual harassment, there was no evidence of any adverse job action, and in regard to hostile work environment sexual harassment, the evidence showed that NTB promptly responded to the accusations when provided notice of the situation. The trial court also ruled, as to Wilkerson, that there was "no authority for the proposition that an individual employee could be held liable for sexual harassment where the employer had been dismissed." Id. at 470, 652 N.W.2d 503.
*253 The Jager panel affirmed the trial court's grant of summary disposition. With respect to individual liability under the CRA, the Court began its analysis by rejecting this Court's decision in Jenkins v. Southeastern Michigan Chapter, American Red Cross, 141 Mich.App. 785, 369 N.W.2d 223 (1985), wherein it was held that individual defendants could be held liable under the CRA. Jager, supra at 478, 482, 652 N.W.2d 503. The Court in Jager chose not to follow Jenkins, pursuant to MCR 7.215(I)(1),[3] because Jenkins relied on federal case law that was not controlling and that was implicitly overruled, and because a majority of federal courts interpreting title VII of the Federal Civil Rights Act of 1964 have found that there is no individual liability under title VII. Jager, supra at 481-482, 652 N.W.2d 503. Accordingly, the Jager panel undertook its own examination of individual liability under the CRA.
To keep the ruling in Jager in context, we first note the relevant statutory provisions that were the subject of the Jager litigation. MCL 37.2202, which addresses discriminatory practices and forms the basis for sexual harassment claims, along with MCL 37.2103(i), Chambers, supra at 309, 614 N.W.2d 910, provides, in subsection 1, that "[a]n employer shall not" engage in discrimination. (Emphasis added.) MCL 37.2201(a) defines "employer" as "a person who has 1 or more employees, and includes an agent of that person." MCL 37.2103(g) defines a "person" as including, among other entities and designations, an individual, agent, or corporation.
The Jager panel stated and concluded:
[O]ur Legislature used substantially similar language when including "agent" in the definition of employer under the CRA ("and includes an agent of that person"), MCL 37.2201(a), as is found in title VII ("and any agent of such a person"), 42 USC 2000e(b). We believe that, like title VII, the language in the definition of "employer" concerning an "agent" of the employer was meant merely to denote respondeat superior liability, rather than individual liability. In fact, our Supreme Court recently observed that the reference to "an agent" in the CRA's definition of employer "addresses an employer's vicarious liability for sexual harassment committed by its employees." Chambers, supra, 463 Mich. at 310, 614 N.W.2d 910....
* * *
Read as a whole, the CRA envisions, in our opinion, employer liability for civil rights violations that result from the acts of its employees who have the authority to act on the employer's behalf rather than individual liability for those civil rights violations. Further, had our Legislature intended individual, rather than employer, liability under the CRA, it could have expressly stated so. Thus, we conclude that the CRA provides solely for employer liability, and a supervisor engaging in activity prohibited by the CRA may not be held individually liable for violating a plaintiff's civil rights. [Jager, supra at 484-485, 652 N.W.2d 503.]
We conclude that Jager directs us to hold that Baergen cannot be held individually liable for the sexual harassment claims asserted by plaintiff. Of course, plaintiff's former employer, defendant MTD, does not benefit from the decision in Jager. With regard to plaintiff's retaliation claim, however, we find that Baergen can indeed be held individually liable because Jager is distinguishable in that Jager *254 specifically dealt with the interpretation of the language in the antidiscrimination provision of the CRA, and we are, instead, required to interpret the antiretaliation provision of the CRA that contains language different from that relied on by the Jager panel.
As noted earlier, the antiretaliation provision of the CRA, MCL 37.2701, clearly prohibits "[t]wo or more persons ... or a person" from retaliating or discriminating against a person who has opposed a violation of the CRA or who has made a charge or lodged a complaint under the CRA. In contrast to MCL 37.2202(1), which prohibits an "employer" from engaging in discriminatory practices and which was the focus in Jager, § 2701 refers merely to a "person." And a "person" includes an "individual," MCL 37.2103(g), such as Baergen. The "employer" definition contained in § 2201(a), and referenced in § 2202(1), is simply not implicated in the antiretaliation provision of the CRA.
Reiterating the well-embedded rules of statutory construction in our jurisprudence, our Supreme Court in Pohutski v. City of Allen Park, 465 Mich. 675, 683, 641 N.W.2d 219 (2002), stated:
When faced with questions of statutory interpretation, our obligation is to discern and give effect to the Legislature's intent as expressed in the words of the statute. We give the words of a statute their plain and ordinary meaning, looking outside the statute to ascertain the Legislature's intent only if the statutory language is ambiguous. Where the language is unambiguous, "we presume that the Legislature intended the meaning clearly expressed  no further judicial construction is required or permitted, and the statute must be enforced as written." Similarly, courts may not speculate about an unstated purpose where the unambiguous text plainly reflects the intent of the Legislature. [Citations omitted.]
MCL 37.2701 could not be drafted in a manner that is any more clear or unambiguous; a "person," which by statute and necessity includes an individual, shall not retaliate, and the term invokes individual liability. There is no language that could conceivably be interpreted as limiting an action for retaliation under the CRA against only an employer. Giving effect to the Legislature's intent as expressed in the words of the statute leads us to the conclusion that a CRA retaliation claim under § 2701 can be maintained against individuals apart from employers. There is no need to look outside the statute to ascertain the Legislature's intent. We acknowledge that the Jager panel framed its holding with a broad brush, enunciating that individual liability is precluded under the CRA. But it is abundantly clear, and beyond any reasonable dispute, that the sole basis for the Court's ruling was the language found in the antidiscrimination provision of the CRA, and that the Court never referenced, addressed, or mentioned the antiretaliation provision of the CRA. The language in § 2701 is much broader than that in § 2202. As such, we find that the issue whether there is individual liability under the antiretaliation provision of the CRA was not determined in Jager, thereby giving us the opportunity to address the issue.
Although not binding authority, we find persuasive and agree with the decision by the United States District Court for the Eastern District of Michigan in Poches v. Electronic Data Systems Corp., 266 F Supp 2d 623 (E.D.Mich., 2003). The federal court was faced with the exact question posed to us, i.e., whether there is individual liability under the antiretaliation provision of the CRA in the face of Jager. In *255 regard to the all-encompassing language set forth in Jager, the Poches court stated:

Jager's analysis rests entirely and exclusively upon the "employer" language found in the Elliott-Larsen Act's anti-discrimination provision. It follows, in this Court's view, that Jager does not purport to construe other provisions in the Act, such as the anti-retaliation provision, which are not directed solely at employers. As Jager itself recognizes, the Michigan Legislature "could have expressly stated" its intention to impose "individual, rather than employer, liability," but chose not to do so in the Act's anti-discrimination provision. The anti-retaliation provision, in contrast, does express this legislative intent, through its reference to "persons" rather than "employers." Accordingly, just as Jager's holding rests on the language of the statutory provision at issue in that case, this Court's ruling rests on the different language of the statutory provision at issue here. [Poches, supra at 627 (citation omitted; emphasis in original).]
The federal court in Poches concluded that the antiretaliation provision of the CRA, § 2701, authorized the imposition of individual liability for impermissible retaliatory acts. Id. at 628. We also so conclude. If this is not what the Legislature intended by its use of different terms in the two provisions, it is up to the Legislature to amend accordingly and it is not a matter for this Court.[4]
Defendants argue, however, that plaintiff failed to even plead a retaliation claim. This argument lacks merit. We first note that the trial court ruled that plaintiff did in fact, although inartfully, plead a claim of retaliation. A portion of the argument presented by defendants relies on deposition testimony and relates to issues of fact, which are not pertinent to whether plaintiff pleaded a claim.[5] A review *256 of plaintiff's complaint indicates that a cause of action for retaliation was sufficiently pleaded.
In DeFlaviis v. Lord & Taylor, Inc., 223 Mich.App. 432, 436, 566 N.W.2d 661 (1997), this Court stated that "[t]o establish a prima facie case of unlawful retaliation under the Civil Rights Act, a plaintiff must show (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." (Citations omitted.) Paragraphs 15 and 16 of the complaint alleged:
Plaintiff contacted Brian Fraser, Executive Vice President/General Counsel/Human Relations Director for the Clark defendants to complain of defendant Baergen's treatment toward her. Mr. Fraser stated he would be in Detroit and would meet with plaintiff at that time. Although Mr. Fraser came to Detroit, he never spoke with plaintiff despite her attempts to meet with him.
After plaintiff's attempts to speak with Brian Fraser, defendant Baergen refused to pay an expense voucher for plaintiff and removed her expense account entirely. Defendant Baergen also lowered her duties to those of an administrator....
Plaintiff's complaint further alleged that she was "retaliated against by defendants' agent and employee, Defendant Baergen, throughout the course of her employment." Although the complaint makes a single reference to the retaliation constituting sexual discrimination, we opine that the complaint was sufficient to inform defendants and place them on notice that a retaliation claim was being asserted under the CRA. MCR 2.111(B)(1).[6] The alleged protected activity was the act of lodging a complaint or charge with Fraser about Baergen's discriminatory actions, MCL 37.2701(a).[7] See Jager, supra at 475, 652 N.W.2d 503 (complaint to higher management suffices). The complaint implicitly alleges knowledge by Baergen of the claims and charges made by plaintiff to Fraser, and it specifically alleges adverse employment actions arising from or being caused by the protected activity engaged in by plaintiff.
We hold that plaintiff's CRA retaliation claim against Baergen should not have been dismissed on the basis that Baergen was not her employer. And we further hold that plaintiff sufficiently pleaded a cause of action under the CRA's antiretaliation provision. We next address whether there were genuine issues of material fact sufficient to survive summary disposition with respect to the sexual harassment and *257 retaliation claims against MTD and with respect to the retaliation claim against Baergen.

C. Sexual Harassment and Retaliation Claims and Summary Disposition  MCR 2.116(C)(10)[8]
The trial court granted summary disposition of all claims on the basis of its determination that plaintiff failed to submit sufficient documentary evidence to show a significant causal connection between the protected activity and the alleged retaliatory acts and adverse employment actions and failed to show a hostile work environment. The trial court focused somewhat on the failure to show a correlation between the harassment or retaliation and plaintiff's employment with MTD, as opposed to her employment with Clark. We find, on review de novo, that the documentary evidence created a genuine issue of material fact.
"To establish causation, the plaintiff must show that his participation in activity protected by the CRA was a `significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." Barrett v. Kirtland Community College, 245 Mich. App. 306, 315, 628 N.W.2d 63 (2001). A causal connection can be established through circumstantial evidence, such as close temporal proximity between the protected activity and adverse actions, as long as the evidence would enable a reasonable fact-finder to infer that an action had a discriminatory or retaliatory basis. Town v. Michigan Bell Tel. Co., 455 Mich. 688, 697, 568 N.W.2d 64 (1997); Taylor v. Modern Engineering, Inc., 252 Mich.App. 655, 661, 653 N.W.2d 625 (2002); McLemore v. Detroit Receiving Hosp. & Univ. Medical Ctr., 196 Mich.App. 391, 396-397, 493 N.W.2d 441 (1992).[9]
*258 In the context of a motion under MCR 2.116(C)(10), we begin by reviewing the documentary evidence presented to the trial court. Deposition testimony shows that plaintiff and Baergen, twenty years plaintiff's senior, engaged in an extramarital sexual affair in the 1980s during their employment with Clark. The affair lasted approximately a year. Although the affair ended, plaintiff and Baergen remained on good terms, and in 1989 they worked together to launch MTD, a company that distributed films to theaters, after Baergen was approached with the idea by Bob Kleinhans.[10] On October 14, 1999, plaintiff went out to dinner with Baergen at a restaurant after Baergen sent a note to plaintiff asking her out as "old friends." Baergen indicated that they talked about a number of subjects including his concerns about plaintiff's substantial weight loss, the deterioration of her work habits, her divorce, her relationships, and plaintiff's life in general, work and personal. Plaintiff testified in her deposition that, at the dinner, Baergen sought to rekindle the prior relationship. She rejected his request to resume the relationship. Plaintiff testified:
He came right out and told me. He told me that he was in love with me[,] that I was the only woman that he had ever considered leaving his wife for[,] that he wished that I felt the same way about him that he felt about me, and I guess he really didn't understand why I wasn't interested in resuming that relationship since I was no longer married. . . ."
Baergen did not specifically ask plaintiff to engage in sexual relations. After the dinner, plaintiff and Baergen went to a short meeting related to the MTD business and nothing unusual occurred at the meeting. Within a day or so after the dinner, Baergen sent a letter to plaintiff, which could reasonably be construed as an apology for his behavior at dinner in putting plaintiff on the spot regarding resuming the relationship and indicating that Baergen may have had a few too many drinks. The letter, while reflecting a tone of love and disappointment and also being apologetic, contained the following cryptic words of advice: "Be careful as you seek out little pockets of happiness. Everything in life has a price tag and payment always comes due." Baergen made no further attempts to resume the prior sexual relationship.
Plaintiff testified that after her rejection of Baergen's advances, he initiated a campaign against plaintiff at work that included angry and volatile verbal explosions directed at plaintiff, screaming, swearing, and demeaning language. Baergen would *259 berate plaintiff allegedly without justification, and he, at times, would throw things such as pencils during an angry outburst. Plaintiff asserted that Baergen would accuse her of being on the phone too long, having sexual relationships with male customers and clients, and of not properly performing her job. And he would question her about her lunchtime activities, asking if she had engaged in sexual relations with others. Baergen was constantly commenting about plaintiff's personal life and denigrating plaintiff's work and the work of employees under her supervision. One time, Baergen became so inflamed over a believed affair that he punched a wall and had to seek medical treatment. Plaintiff stated that, in the last three months of her employment, which ended with MTD and Clark in July 2000 when she quit or was "constructively discharged," there was an outburst or incident virtually every day. Often, Baergen would berate plaintiff to tears and in front of other employees. A Clark employee testified in his deposition that he recalled an incident in which he was merely assisting plaintiff in finding something in the Clark warehouse, for which Baergen became enraged to the point that he screamed at plaintiff, calling her a "f dumb bitch," which left plaintiff in tears. This employee also recalled Baergen communicating to him that plaintiff was having an affair with a particular customer. Other employees testified about Baergen's outbursts directed at plaintiff, or verbal confrontations between plaintiff and Baergen, along with seeing plaintiff in tears as a result. Baergen would also discuss with others whether plaintiff was having sexual relations with a customer. Although the time frame was not always specific with respect to particular incidents, it can be gleaned from the deposition testimony of all those deposed that the verbally abusive behavior occurred from November 1999 until plaintiff left the companies in July 2000. Additionally, it appears that the verbally abusive behavior occurred on Clark's premises.
Within a week of the dinner, Baergen asked plaintiff to sign a noncompete agreement for Clark, and plaintiff refused without incident. Plaintiff acknowledged that Clark had previously sought a noncompete agreement from her and other employees before the October 1999 dinner, but not of other employees afterwards. There was documentary evidence indicating that commencing in November 1999 and lasting through July 2000, Baergen required that he sign off on duties that plaintiff had typically handled independently before then. Baergen requested that plaintiff think about going into sales full time and giving up her sales manager position and her marketing and customer service responsibilities. Baergen then began reducing these duties and responsibilities, including her advertising and account assignment duties, without a legitimate basis according to plaintiff, and plaintiff testified that she was informed by Baergen in July 2000 that he had hired someone else to be the sales manager. There was testimony by an accounts receivable employee, however, suggesting that plaintiff was not performing at an acceptable manner, in that she kept messing up paperwork. Plaintiff indicated that she subsequently discovered that Baergen had told headquarters that he had actually terminated her as sales manager on March 1, 2000. The job duties and responsibilities discussed by us in this paragraph related to plaintiff's employment with Clark. In regard to vehicle expenses that were not paid to plaintiff per Baergen's instructions, she stated that it did not pertain to expenses incurred for MTD but for Clark. A March 6, 2000, letter regarding the expenses penned by plaintiff and sent to *260 Baergen, suggested that she might go higher up to mediate the issue, and Baergen's written response was "go wherever the f___k you want."
Plaintiff's deposition reflects that her responsibilities with MTD included computer billing, contacting clients, doing mailers, negotiating insurance, interviewing and meeting with drivers, making bank deposits, and paying bills. Plaintiff insisted that she was a twenty-five percent owner of MTD, that she was the secretary-treasurer, and that Baergen stole her interest. Baergen testified that plaintiff did not own an interest in MTD. Regarding MTD duties, plaintiff stated that she spent about twelve to fifteen hours a week working for the business on average, but it varied depending on such things as special openings and events; Baergen testified that plaintiff spent about ten hours a week doing MTD work. Plaintiff indicated that at times she could work as many as thirty hours a week for MTD. She testified in her deposition that the bulk of the work, bookkeeping, accounts payable, billing, and payroll, was done on evenings and Saturdays from her home. Plaintiff asserted that two to five hours of the MTD weekly work was done in Baergen's presence. There was also substantial evidence showing that Baergen and plaintiff were conducting MTD business during their hours at Clark. Many MTD phone calls were fielded by plaintiff and Baergen on Clark time. MTD-related documents were often faxed to Baergen at Clark. A lockbox was kept on Clark's premises, where MTD documents were kept and dropped off by drivers. An employee of MTD and Clark who took over plaintiff's duties after plaintiff left in July 2000 testified that he continued as plaintiff had done by basically fielding MTD phone calls, booking films, making runs, and handling faxes while at Clark. This ceased when the Clark corporate office discovered what was occurring.
Evidence showed that up through 1998, plaintiff was earning on average about $30,000 a year with MTD. This amount included a salary and bonuses that were typically given out at the end of the year but at times sporadically during the year. For 1999, plaintiff was only paid approximately $12,500, and there was no evidence that MTD saw a reduction in business for the year. It appears that a bonus was not paid to plaintiff for 1999, and a March 6, 2000, letter from Baergen to plaintiff reflects him questioning why he should pay her $10,000, considering the work plaintiff actually performed for MTD. Plaintiff responded in writing, on that same letter, that she was still a part owner and therefore should receive her bonus.[11] Plaintiff's response also indicated that she would happily accept doing the duties of billing and payroll if he returned those duties to her. There was evidence showing that Baergen had taken away most of the MTD duties from plaintiff and had given them to another individual, and that by July 2000, plaintiff's involvement was quite limited. There is also record evidence reflecting that Baergen removed MTD duties from plaintiff because she was not completing MTD bookkeeping matters in what Baergen believed to be a timely manner. Plaintiff insisted that Baergen made misrepresentations regarding her work for MTD. What is unclear from the record is *261 the time frame in which various MTD duties were removed from plaintiff's responsibility. There was general testimony by plaintiff that all the adverse actions and verbal abuse she suffered took place after October 1999 when she rejected Baergen's request to resume their relationship.[12] The husband of the woman who took over some of the MTD duties from plaintiff testified that he thought his wife started working for MTD in late 1998 or early 1999, but it could have been late 1999 or early 2000. The record contains a copy of a single MTD check made out to "cash" for bookkeeping services, dated August 1999, and endorsed by plaintiff's replacement. We opine that a fact question remains with regard to the date that Baergen removed plaintiff's MTD duties and responsibilities.
In January or February 2000, plaintiff verbally complained to Brian Fraser, Clark's executive vice-president/general counsel/human relations director, about Baergen's abusive, discriminatory, and harassing behavior and the unfair treatment that she was receiving. Plaintiff charged that Baergen acted in a demeaning manner toward her, was unprofessional, and would swear and scream at plaintiff. According to plaintiff, Fraser cut her short, indicating that he would be in town within a couple of weeks and would discuss the matter further. However, when Fraser was in town, he did not talk to plaintiff, although he spoke to Baergen, and Baergen stated that there was no problem. Fraser later told plaintiff that he did not speak to her at Clark because he did not want to make her feel uncomfortable in front of Baergen. Fraser testified, acknowledging that he received a complaint from plaintiff about Baergen's behavior and spoke to Baergen, but asserting that plaintiff never made any allegations concerning sexual misconduct or communications; there was no sexual harassment complaint. According to plaintiff, a conversation between her and Baergen revealed that he knew that she had complained to Fraser about his behavior. A Clark-MTD employee testified that he once had an altercation with Baergen and threatened to complain to corporate headquarters about Baergen, and Baergen stated that the one thing he would never tolerate was an employee going over his head. This employee further testified that plaintiff told him that she was leaving Clark and MTD because of the actions of Baergen.
To establish a claim of quid pro quo sexual harassment in the workplace, a plaintiff must demonstrate, by a preponderance of the evidence, that (1) he or she was subjected to unwelcome sexual conduct or communications as described in the statute, and (2) that the employer or the employer's agent used submission to or rejection of the proscribed conduct as a factor in a decision affecting employment. Chambers, supra at 310, 614 N.W.2d 910, quoting Champion v. Nationwide Security, Inc., 450 Mich. 702, 708-709, 545 N.W.2d 596 (1996). The issue presented to us is whether there was sufficient evidence to create a factual issue regarding whether plaintiff's rejection of Baergen's advances was a significant factor in employment *262 decisions concerning plaintiff, such that the quid pro quo sexual harassment claim against MTD should proceed to trial.
Because this claim is against MTD, the evidence must be viewed in the context of adverse employment actions tied directly to MTD, as opposed to Clark. This does not, however, mean that Baergen's Clark-related actions cannot be considered as circumstantial evidence of his intent and motivation for making MTD decisions affecting plaintiff. There was evidence of a reduction of plaintiff's MTD duties and responsibilities and a significant reduction in salary in close temporal proximity to plaintiff's rejection of Baergen's advances and desire to rekindle the prior sexual relationship. This, along with the extensive evidence of verbal abuse after October 1999, the letter drafted by Baergen following the "old friends" dinner, and the Clark-related adverse employment decisions, provided circumstantial evidence of a significant causal connection between the unwelcome communication and Baergen's MTD employment decisions, sufficient to show that any reasons for the decisions may have been a pretext and sufficient to survive summary disposition.
To establish a claim of hostile environment sexual harassment in the workplace, a plaintiff must demonstrate, by a preponderance of the evidence, that: (1) the employee belonged to a protected group; (2) the employee was subjected to conduct or communication on the basis of sex; (3) it was unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior. Chambers, supra at 311, 614 N.W.2d 910, quoting Radtke v. Everett, 442 Mich. 368, 382-383, 501 N.W.2d 155 (1993).[13] The issue presented to us on this claim is whether there was evidence, sufficient to survive summary disposition, showing the existence of a hostile work environment in relation to plaintiff's MTD employment, such that the claim against MTD should proceed to trial.
Clearly, there was sufficient evidence of a hostile work environment predicated on abusive behavior closely following the rejection of Baergen's unwelcome attempt to resume a sexual relationship and predicated on Baergen's numerous comments to plaintiff that were of a sexual nature and that questioned her sexual activities. See Haynie, supra at 309, 664 N.W.2d 129. The more difficult issue is whether there was evidence of a hostile "MTD" work environment. Defendants argue that there was no actual MTD work environment, and alternatively, because plaintiff worked out of her home, and because there *263 was no evidence of verbal abuse and angry outbursts at her home, there can be no claim for a hostile work environment. We disagree. While the evidence indicated that Baergen's intimidating, hostile conduct and communications occurred on the premises at Clark, there was evidence that MTD work was being performed at Clark by plaintiff and Baergen on a regular basis. Essentially, the Clark and MTD work environments were one and the same. As the trial court noted, Baergen was wearing two hats, and those hats, including the MTD hat, were being worn on Clark's premises. Summary dismissal was not appropriate.
Finally, in regard to the retaliation claim against both MTD and Baergen, there was sufficient evidence to survive summary disposition. The issue presented to us on this claim is whether there was sufficient evidence to create a factual issue regarding whether plaintiff's complaint to Fraser had a causal connection to adverse employment actions, such that the retaliation claim against MTD and Baergen should proceed to trial. See DeFlaviis, supra at 436, 566 N.W.2d 661.
With respect to Baergen, the close temporal proximity between the January-February 2000 complaint to Fraser and the verbal abuse, berating conduct, and adverse or negative employment decisions, whether related to MTD or Clark, along with the cryptic October 1999 letter that could be interpreted as threatening retribution, provided circumstantial evidence of a significant causal connection between the complaint and adverse employment actions, sufficient to show that any reasons for the employment decisions may have been a pretext and sufficient to survive summary disposition.
With respect to MTD, while the adverse employment actions are somewhat more attenuated and the evidence not as strong as the correlation between the Fraser complaint and the adverse employment actions affecting the Clark employment, there was sufficient evidence to survive summary disposition, where, considering the totality of the circumstances already explored at length in this opinion, a connection could be made between the complaint and the reduction in plaintiff's MTD duties and salary.[14]
We reject defendants' argument that plaintiff did not engage in protected activity because she did not specify the sexual nature of Baergen's misconduct when speaking to Fraser. MCL 37.2701(a) prohibits retaliation where a party lodges a charge or a complaint about a violation of the CRA. While we acknowledge *264 that plaintiff's deposition testimony did not specify sexual misconduct, MCL 37.2103 and MCL 37.2202 prohibit sexual harassment and discriminatory practices, and plaintiff testified that she expressly communicated to Fraser, an attorney, that she was being harassed and discriminated against by Baergen. In McLemore, supra at 396, 493 N.W.2d 441, this Court, addressing a similar issue, stated:
In Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1312-1314 (C.A.6, 1989), the federal court of appeals decided that the Civil Rights Act did not protect from retaliation an employee who had merely expressed concern to his employer about possible discrimination. We strongly disagree with this interpretation of the act. Regardless of the vagueness of the charge or the lack of formal invocation of the protection of the act, if an employer's decision to terminate or otherwise adversely effect an employee is a result of that employee raising the spectre of a discrimination complaint, retaliation prohibited by the act occurs. We will not interpret the act to allow employers to peremptorily retaliate against employees with impunity.
Here, regardless of plaintiff's failure to formally invoke protection under the CRA while speaking with Fraser, her claims of demeaning conduct and communication, harassment, and discrimination by a male boss, especially when made to an attorney, minimally created a factual issue whether plaintiff raised the specter of a discrimination complaint and was thus engaged in protected activity.[15]

DOCKET NO. 243795

A. Standard of Review
The determination of the existence of a conflict of interest is a fact question that is reviewed under the "clearly erroneous" standard of MCR 2.613(C). Buchanan v. City Council of Flint, 231 Mich.App. 536, 547, 586 N.W.2d 573 (1998); People v. Doyle, 159 Mich.App. 632, 641, 406 N.W.2d 893 (1987), modified on other grounds (On Rehearing), 161 Mich.App. 743, 411 N.W.2d 730 (1987). A trial court's findings of fact are clearly erroneous only where we are left with a definite and firm conviction that a mistake has been made. *265 Samuel D Begola Services, Inc. v. Wild Bros., 210 Mich.App. 636, 639, 534 N.W.2d 217 (1995). The application of "ethical norms" to a decision whether to disqualify counsel is reviewed de novo. General Mill Supply Co. v. SCA Services, Inc., 697 F.2d 704, 711 (C.A.6, 1982).

B. Attorney Disqualification
Clark challenges the disqualification of counsel by arguing that the Michigan Rules of Professional Conduct (MRPC) permit an attorney and client to limit the scope of representation, as was done here. Clark also argues that any further representation was conditioned on the lack of any conflict of interest. Clark insists that on the basis of the initial discussion with Baergen concerning representation and the allegations in the complaint, it had no information to conclude that a conflict existed or potentially existed, and it lacked the time to make an independent investigation before the filing deadline. Clark, relying on Restatement of the Law Governing Lawyers, § 132, further argues that ethics rules expressly permit an attorney to seek and rely on a client's waiver of a conflict of interest or potential conflict of interest in advance of representation, where the attorney is offering representation as an accommodation to an existing client. Clark also maintains that support for upholding Baergen's agreement to abide by the terms of the representation is found in the fact that Baergen knew about a possible conflict and was not forthcoming and signed the acknowledgement anyway, especially where the document fully informed Baergen of the situation and possibility that Clark's counsel would have to withdraw representation. According to Clark, a lawyer should not be disqualified for a conflict of interest in a matter for which the allegedly aggrieved former client has executed a voluntary waiver of a conflict of interest. Finally, Clark argues that the limited engagement of representation was not substantially related to the cross-claim filed eight months later, which cross-claim was based on facts adduced after the representation concluded.
Defendants first argue that this Court lacks jurisdiction to hear this issue as Clark lacks standing. The argument is predicated on MCR 7.203 and the requirement that an appeal be taken only by an aggrieved party. Defendants maintain that, because Clark settled the lawsuit with plaintiff after this Court granted leave, Clark is no longer a party with an interest in the subject matter of the litigation. Defendants assert that Clark's legal rights are no longer invaded, nor does it have a pecuniary interest that is being adversely affected. Defendants' appellate brief notes that Clark has already commenced an independent action against Baergen and MTD in the Oakland Circuit Court, File No. 03-050254-CZ. Finally, defendants argue that, regardless of the issue of jurisdiction, the trial court's ruling was sound given that Clark's original counsel sought to add a cross-claim against defendants, and defendants never waived any conflict of interest nor consented to counsel taking an adverse action against them.
We first turn to the issue of standing and jurisdiction. This Court in Dep't of Consumer & Industry Services v. Shah, 236 Mich.App. 381, 385, 600 N.W.2d 406 (1999), stated:
To have standing to appeal means that a person must be "aggrieved" by a lower body's decision. MCR 7.203(A). This Court has defined the term "aggrieved party" as "`one whose legal right is invaded by an action, or whose pecuniary interest is directly or adversely affected by a judgment or order. It is a party who has an interest in the *266 subject matter of the litigation.'" [Citations omitted.]
While it is true that Clark settled the litigation with plaintiff, the order of disqualification issued by the trial court clearly indicates that the order was not limited to the litigation at hand but applied equally to any prospective litigation that Clark may commence in the future against defendants, which was a near certainty and has apparently occurred. Were Clark to use the services of disqualified counsel in a subsequent action against defendants, we opine that the doctrine of collateral estoppel would require the court in the subsequent action to recognize and apply the disqualification order entered in this case. At that point, Clark would no longer be in a position to challenge the underlying disqualification order. Accordingly, Clark's legal right to select counsel of its choosing has been invaded regardless of the settlement with plaintiff. Although it might be argued that the matter has become moot in light of the Clark litigation against defendants with new counsel, Clark could still choose to substitute counsel, and it cannot be stated with definitiveness that other actions by Clark against defendants will not occur.
Next, we address the substance of Clark's arguments. "The party seeking disqualification bears the burden of demonstrating specifically how and as to what issues in the case the likelihood of prejudice will result." Kubiak v. Hurr, 143 Mich.App. 465, 471, 372 N.W.2d 341 (1985) (citations omitted). MRPC 1.2(b) provides that "[a] lawyer may limit the objectives of the representation if the client consents after consultation." Therefore, the actions of Clark's counsel to limit representation of defendants to the filing of an answer and affirmative defenses and thereafter only to the extent that no conflict was discovered was well within the confines of the MRPC.
MRPC 1.9 provides, in relevant part:
(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.
* * *
(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
(1) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, or when the information has become generally known; or
(2) reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.
Clark's counsel formerly represented Baergen and MTD and sought to continue representing another client, Clark, in the same matter. Considering that the motion for leave to add a cross-claim was denied, and the lawsuit proceeded against all named defendants with the question being Clark's and defendants' liability to plaintiff for the alleged CRA violations, we question whether Clark's interests were materially adverse to defendants for purposes of the particular suit and issues presented. Nonetheless, because Clark evidenced an intent to file suit against defendants, and because the trial court's disqualification order is not limited to the CRA suit, it can be concluded that Clark's interests are indeed materially adverse to defendants' *267 interests. The question becomes whether defendants consented after consultation and, if so, was disqualification still required.
We find that Clark's counsel fully explained the nature of the limited representation, filing an answer and affirmative defenses, and the parameters that would guide any further representation, i.e., the lack of any conflict of interest. Baergen specifically agreed and consented that if a conflict were discovered, counsel could continue representing Clark. Therefore, consistent with MRPC 1.9(a), there was consent after consultation. While we recognize that consent was given before a conflict of interest was revealed, the written agreement anticipated the possibility of such a conflict, and Baergen agreed that if a conflict arose, counsel could maintain representation of Clark. We further acknowledge that the consultation did not involve a discussion by counsel of the particulars of a conflict of interest for which consent was sought, as no conflict had yet been revealed to counsel. However, Baergen himself was obviously aware of the history and nature of MTD and his non-compete agreement with Clark, but he still executed the retention agreement, approving of Clark's continued representation by counsel even in the face of a conflict of interest.
Further, there was no evidence that Clark's counsel used any confidential information obtained through the limited representation to the disadvantage of defendants. If indeed counsel had done so, the likelihood is that the motion for leave to file a cross-claim would have been filed soon after representation was terminated. Rather, the motion to add a cross-claim was filed eight months later and it was predicated on deposition testimony garnered long after representation ceased. There is no indication in the record that counsel obtained relevant and damaging information during the limited representation that was not subsequently revealed through Baergen's own deposition testimony. We see no ethical dilemma in allowing counsel to continue representing Clark in matters against defendants. Defendants failed to sustain their burden to show grounds for disqualification. Kubiak, supra at 471, 372 N.W.2d 341. As our Supreme Court stated in Smith v. Arc-Mation, Inc., 402 Mich. 115, 118, 261 N.W.2d 713 (1978):
The trial court ... and the Court of Appeals appear to be saying that if any arguable question can be raised regarding the propriety of a lawyer continuing to appear in a case, an order can be obtained disqualifying that lawyer. That constitutes, in our opinion, a dangerous doctrine. It puts in the hands of an adversary the ability to force an opponent to change counsel if the adversary can advance any arguable grounds in support of disqualification.
We fully agree and conclude that the trial court erred in granting defendants' motion for disqualification.[16]

III. CONCLUSION
We affirm in part and reverse in part the grant of summary disposition in Docket No. 248124 and remand for further proceedings. The trial court erred in finding no genuine issue of material fact regarding the sexual harassment claims and retaliation claim against MTD. The trial court did not err in finding that Baergen could not *268 be held individually liable for the sexual harassment claims. But the court erred in ruling that Baergen could not be held individually liable for a claim brought under the antiretaliation provision of the CRA. Further, the trial court erred in finding that there was no issue of material fact with respect to the retaliation claim against Baergen.
In Docket No. 243795, we reverse the order disqualifying Clark's counsel because there was a lack of evidence showing a conflict of interest or improper use of confidential information requiring disqualification, and because Baergen expressly consented to counsel's continued participation should a conflict be discovered.
Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NEFF, J., concurred.
KIRSTEN FRANK KELLY, P.J. (Concurring in part and dissenting in part).
I respectfully dissent from the majority's decision that the trial court erred in granting summary disposition of plaintiff's retaliation claim against defendants MTD Systems, Inc., and Herman Baergen. First, plaintiff did not properly plead a retaliation claim under the CRA. Second, even if she had properly pleaded a retaliation claim, she failed to establish that she was engaged in a protected activity under the CRA. Third, plaintiff failed to establish a causal connection between the telephone calls to Brian Fraser and the adverse employment action. Finally, within the context of employment discrimination, the plain language of CRA, read as a whole, does not provide a cause of action against individuals under either article 2 or article 7.

I. Standard of Review
"The decision to grant or deny summary disposition is a question of law that is reviewed de novo." Veenstra v. Washtenaw Country Club, 466 Mich. 155, 159, 645 N.W.2d 643 (2002). "The interpretation and application of a statutory provision is a question of law that is reviewed de novo by this Court." Id. The following rules apply to judicial interpretation of the CRA:
We read the CRA in light of the primary goal of judicial interpretation, which is to ascertain and give effect to the intent of the Legislature. If the plain and ordinary meaning of a statute is clear, judicial construction is neither necessary nor permitted. We may not speculate about the probable intent of the Legislature beyond the words expressed in the statute. If a statute provides its own glossary, the terms must be applied as expressly defined. When reasonable minds may differ with respect to the meaning of a statute, the courts must look to the object of the statute and the harm it is designed to remedy and apply a reasonable construction that best accomplishes the purpose of the statute. [Barrett v. Kirtland Community College, 245 Mich.App. 306, 313-314, 628 N.W.2d 63 (2001) (citations omitted).]

II. Retaliation
To establish a prima facie case of retaliation under MCL 37.2701(a), a plaintiff must show:
(1) that the plaintiff engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action. [Meyer v. Centerline, 242 Mich. *269 App. 560, 568-569, 619 N.W.2d 182 (2000).]
I agree with the majority that plaintiff's complaint is "fairly cursory." Although the word "retaliation" appears in Count I, the term is merely used to describe conduct that plaintiff identifies as sexual discrimination in violation of the CRA. More specifically, the word "retaliation" appears three times in Count I of plaintiff's complaint:
22. Plaintiff was sexually harassed and retaliated against by defendants' agent and employee, Defendant Baergen, throughout the course of her employment.
23. This sexual harassment and retaliation included, but is not limited to, unwelcome comments and conduct of an offensive and sexual nature directed at plaintiff, the creation of a hostile work environment, as described herein and constructively terminating plaintiff's employment withholding pay commissions due to her, based on her refusal to engage in a sexual relationship with Defendant Baergen.
* * *
25. The conduct of defendants' agent and employee in sexually harassing and retaliating against plaintiff constitutes sexual discrimination in violation of MCLA 37.2101 et seq.
The alleged sexual harassment identified in Count I falls directly within MCL 37.2103:
(i) Discrimination because of sex includes sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:
* * *
(ii) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment ....

(iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment....
While reference to a specific statutory provision is not required, plaintiff did not reference MCL 37.2701, which could have put defendants on notice that retaliation was being pleaded. More importantly, however, plaintiff did not allege that she was engaged in a protected activity or that a causal connection existed between the protected activity and the adverse employment action. Instead, plaintiff simply alleged quid pro quo and hostile work environment sexual harassment, two types of sexual discrimination prohibited by the CRA. As such, the complaint was insufficient to put defendants on notice that a retaliation claim was also being pleaded.

III. Protected Activity
I also disagree that the two telephone calls to Fraser constituted protected activity. MCL 37.2701 prohibits retaliation or discrimination against a person "because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." (Emphasis added.)
In assessing whether plaintiff has established a prima facie case, the first inquiry is whether she engaged in protected activity sufficient to satisfy the first element. Plaintiff testified that she told Fraser:
I felt that I was being harassed. I felt that I was being pushed out, and I wanted some help. I didn't think I could handle it.

*270 * * *
I told him several instances with Herman where he had been out of line. He was disputing agreements that we had made.
* * *
I told him about the swearing. I told him about the  what I felt was unfair treatment and the argumentative nature that I was being treated with.
The entire conversation lasted approximately two minutes and plaintiff never indicated that she was being sexually harassed. With regard to the second call, plaintiff testified that she asked Fraser how the conversation went with Baergen. When Fraser indicated that Baergen said there was no problem, plaintiff told Fraser he was misinformed. Again, plaintiff did not indicate that she was being sexually harassed. An employee "must do more than generally assert unfair treatment." Barrett, supra at 318-319, 628 N.W.2d 63. An employee "must clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination pursuant to the CRA." Id. at 319, 628 N.W.2d 63. "[G]eneric, non-sex-based" complaints are insufficient. Id. Therefore, plaintiff's two telephone conversations with Fraser were not protected activities under MCL 37.2701.

IV. Causal Connection
Even if plaintiff's telephone calls were protected activity, she failed to establish a genuine issue of fact with regard to a causal connection between the telephone calls to Fraser and the adverse employment action.
"To establish causation, the plaintiff must show that his participation in activity protected by the CRA was a `significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." Barrett, supra at 315, 628 N.W.2d 63. In West v. Gen. Motors Corp., 469 Mich. 177, 184-187, 665 N.W.2d 468 (2003), our Supreme Court analyzed the requirements to establish a "causal connection" between protected activity and an adverse employment action. The Court concluded that a plaintiff "must show something more than merely a coincidence in time between protected activity and adverse employment action." Id. at 186, 665 N.W.2d 468.
In this case, there was no genuine issue of fact that plaintiff's telephone calls to Fraser were a significant factor in the employment actions taken against plaintiff. Viewing the facts in the light most favorable to plaintiff, the evidence clearly shows a long-term negative reaction to plaintiff's refusal to engage in a sexual relationship with Baergen. This activity did not cease after plaintiff called Fraser  it continued in a similar and like fashion. There is absolutely no evidence that the call to Fraser had anything to do with the subsequent adverse employment action. Rather, the evidence indicates that the adverse employment action was directly attributable to plaintiff's rejection of Baergen's initial proposition as she specifically alleges in paragraph 23 of her complaint.

V. Individual Liability
Finally, in the context of employment discrimination, the CRA does not provide a cause of action for retaliation against individuals under either article 2 or article 7.
"We construe an act as a whole to harmonize its provisions and carry out the purpose of the Legislature." Macomb Co. Prosecuting Attorney v. Murphy, 464 Mich. 149, 159, 627 N.W.2d 247 (2001). (Emphasis added.) The CRA is composed of eight articles that serve distinct purposes. Article 1 consists of definitions that apply to the entire act. The discriminatory *271 actions prohibited by the CRA are set forth in articles 2 through 5, which individually contain definitions and rules only applicable to the type of discrimination addressed in that particular article: article 2 prohibits employment discrimination, article 3 prohibits discrimination in places of public accommodation, article 4 prohibits discrimination in educational institutions, and article 5 prohibits housing discrimination. There are three remaining articles: article 6 establishes the civil rights commission and its procedures, article 7 prohibits retaliation against a person who has taken action in opposition to a violation of the CRA, and article 8 provides additional rules for claims brought under the CRA.
The majority correctly asserts that this Court has construed article 2 to permit claims of employment discrimination to be brought only against employers, not individuals. Jager v. Nationwide Truck Brokers, Inc., 252 Mich.App. 464, 652 N.W.2d 503 (2002). I agree that despite being strewn with references to the CRA generally, Jager only construes the language in article 2. Thus, its holding does not extend to any other article in the CRA, including article 7 that is at issue here. Nonetheless, Jager affects the application of article 7 within the context of employment discrimination claims.
MCL 37.2701 provides:
Two or more persons shall not conspire to, or a person shall not:
(a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.
(b) Aid, abet, incite, compel, or coerce a person to engage in a violation of this act.
(c) Attempt directly or indirectly to commit an act prohibited by this act.
* * *
(e) Willfully obstruct or prevent a person from complying with this act or an order issued or rule promulgated under this act.
(f) Coerce, intimidate, threaten, or interfere with a person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.
The majority correctly observes that MCL 37.2701 uses the term "person" rather than "employer." But I disagree with the conclusions it draws from this observation. MCL 37.2701 must be viewed in light of its purpose in relation to the CRA as a whole. It is clear that article 7 operates as an umbrella to protect people in their "exercise or enjoyment of, any right granted or protected by this act." Thus, it protects people who are pursuing claims that arise from violations of articles 2 through 5. Employment discrimination is only one of these types of violations. Clearly, article 7 does not use the term "employer" because it does not serve only to protect people in pursuance of claims that arise only under article 2. Article 7 uses the broader term "person" because it protects people in pursuance of claims, arising under articles 2 through 5, brought against various entities, including employers, places of accommodation, educational institutions, persons engaged in real estate transactions, etc.
Because article 2 specifically prohibits employers from discriminating, in the context of employment discrimination, article 7 can only apply to employers. As noted by the majority, our Supreme Court out-lined *272 the basic principles underlying a sexual harassment lawsuit in the employment context:
Through the Civil Rights Act, Michigan law recognizes that, in employment, freedom from discrimination because of sex is a civil right. MCL 37.2102; MSA 3.548(102). Employers are prohibited from violating this right, MCL 37.2202; MSA 3.548(202), and discrimination because of sex includes sexual harassment, MCL 37.2103(i); MSA 3.548(103)(i). [Chambers v. Trettco, Inc., 463 Mich. 297, 309, 614 N.W.2d 910 (2000) (emphasis added).]
Jager held that only employers are prohibited from discriminatory actions under article 2:
Read as a whole, the CRA envisions, in our opinion, employer liability for civil rights violations that result from the acts of its employees who have the authority to act on the employer's behalf rather than individual liability for those civil rights violations. Further, had our Legislature intended individual, rather than employer, liability under the CRA, it could have expressly stated so. Thus, we conclude that the CRA provides solely for employer liability, and a supervisor engaging in activity prohibited by the CRA may not be held individually liable for violating a plaintiff's civil rights. [Jager, supra at 485, 652 N.W.2d 503.]
Accordingly, in the context of employment discrimination, employers are prohibited from violating article 2 of the CRA and the "persons" prohibited from retaliating are employers.
This conclusion is further supported by the plain meaning of the term "retaliate," which is not expressly defined in the CRA. Therefore, it is appropriate to look to the common definition of retaliate. Mahnick v. Bell Co., 256 Mich.App. 154, 162, 662 N.W.2d 830 (2003). Retaliate is defined as "to return like for like ... to requite or make return for (a wrong or injury) with the like." Retaliate is synonymous with counter, repay, and reciprocate. Random House Webster's Unabridged Dictionary (2001). "To return like for like" requires that the interaction occur between two parties. The party acted against retaliates against the actor. One cannot retaliate if it was not first subject to an adverse act. In the employment discrimination context, retaliation involves an employer that is subject to a discrimination claim taking adverse action against the employee who has engaged in a protected activity with regard to that claim.
In sum, a retaliation claim cannot exist independent of a prohibited discriminatory action under articles 2 through 5 of the CRA. As such, any claim for retaliation is related to another claim of discrimination under one of those articles. Because article 2 does not permit a cause of action against individuals for sexual harassment, within the context of employment discrimination, article 7 likewise does not provide a cause of action for retaliation against individuals. The retaliation claim that plaintiff claims to have alleged was against Baergen who was not her employer, but only had authority to act on her employer MTD's behalf. In my view, the CRA does not permit such a claim.
For these reasons, I would hold that the trial court did not err in granting summary disposition of plaintiff's retaliation claim against defendants MDT and Baergen. I concur in all other aspects of the majority's decision.
NOTES
[1] Plaintiff also presented a claim for wrongful withholding of sales commissions brought pursuant to the sales representatives' commissions act (SRCA), MCL 600.2961. This claim was also summarily dismissed. But plaintiff is not challenging the dismissal on appeal. Accordingly, we shall make minimal reference to allegations and documentary evidence touching on the SRCA cause of action.
[2] We note that members of this panel have conflicting opinions on the soundness of Jager as reflected in the majority and concurring opinions issued in Elezovic. But we are in agreement that Jager represents the law in Michigan and must be followed.
[3] Now MCR 7.215(J)(1).
[4] We respectfully disagree with the analysis set forth in the partially concurring and partially dissenting opinion in this case regarding the applicability of the antiretaliation provision of the CRA, because that analysis requires one to interpret the term "person," as used in MCL 37.2701 and defined in MCL 37.2103(g), not on the basis of the statutory definition, but rather on the basis of the nature of the underlying protected activity, e.g., complaints concerning employment discrimination, housing discrimination, and educational discrimination. Hence, "person" does not always mean "person" as statutorily defined and drafted by the Legislature, sometimes it means only an "employer." This analysis is wholly inconsistent with our Supreme Court's textualist approach and continuing demand that we give meaning to the plain language of statutes and read nothing into them that is not present. See Pohutski, supra at 683-684, 641 N.W.2d 219. "The Court may not assume that the Legislature inadvertently made use of one word or phrase instead of another." Id., quoting Robinson v. Detroit, 462 Mich. 439, 459, 613 N.W.2d 307 (2000). If the Legislature intended only "employer" liability for violation of the antiretaliation provision, where the protected activity related to complaints about employment discrimination, the Legislature could have easily incorporated supportive language; it did not, and we shall not and cannot, by judicial proclamation and interpretation, imply such language. The statutory definition of "person" applies to the entire act or the act as a whole. MCL 37.2103.
[5] Although not specified by the trial court, the court's ruling that summary disposition was appropriate because Baergen could not be held individually liable is akin to a ruling that plaintiff "failed to state a claim on which relief can be granted." MCR 2.116(C)(8). A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of a complaint. Beaudrie v. Henderson, 465 Mich. 124, 129, 631 N.W.2d 308 (2001). The trial court may only consider the pleadings in rendering its decision. Id. All factual allegations in the pleadings must be accepted as true. Dolan v. Continental Airlines/Continental Express, 454 Mich. 373, 380-381, 563 N.W.2d 23 (1997).
[6] We are unaware of any statutory, court rule, or case law pronouncement that requires a plaintiff to cite the specific statutory provision pursuant to which the plaintiff is proceeding in order to state a claim. MCR 2.111(B)(1) provides that a plaintiff, in alleging a cause of action, need only plead factual allegations sufficient to reasonably "inform the adverse party of the nature of the claims the adverse party is called on to defend[.]" Michigan follows the rule of general fact-based pleading. Iron Co. v. Sundberg, Carlson & Assoc., Inc., 222 Mich.App. 120, 124, 564 N.W.2d 78 (1997). Taking into consideration paragraphs 15 and 16 of the complaint, along with the retaliation references in paragraphs 22 through 25, and further considering the elements of the cause of action, we conclude that an antiretaliation cause of action under MCL 37.2701 was sufficiently pleaded.
[7] We reject plaintiff's and the trial court's contention that the protected activity, in the context of the antiretaliation provision, also included plaintiff's rejection of Baergen's sexual advances. See MCL 37.2701. That would simply constitute protected activity for the sexual harassment action.
[8] MCR 2.116(C)(10) provides for summary disposition where there is no genuine issue regarding any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law. Our Supreme Court has ruled that a trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the affidavits or other documentary evidence show that there is no genuine issue in respect to any material fact, and the moving party is entitled to judgment as a matter of law. Smith v. Globe Life Ins. Co., 460 Mich. 446, 454, 597 N.W.2d 28 (1999). In addition, all affidavits, pleadings, depositions, admissions, and other documentary evidence filed in the action or submitted by the parties are viewed in a light most favorable to the party opposing the motion. Id. Where the burden of proof on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in the pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists. Quinto v. Cross & Peters Co., 451 Mich. 358, 362, 547 N.W.2d 314 (1996). Where the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted. Id. at 363, 547 N.W.2d 314.
[9] A plaintiff may establish that she was unlawfully discriminated against through indirect evidence by way of the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Hazle v. Ford Motor Co., 464 Mich. 456, 462-463, 628 N.W.2d 515 (2001). "The McDonnell Douglas approach allows a plaintiff `to present a rebuttable prima facie case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination.'" Id. at 462, 628 N.W.2d 515 (emphasis in original), quoting Debrow v. Century 21 Great Lakes, Inc. (After Remand), 463 Mich. 534, 537-538, 620 N.W.2d 836 (2001). In Hazle, supra at 464, 628 N.W.2d 515, our Supreme Court stated that the "McDonnell Douglas prima facie case does not describe the plaintiff's burden of production, but merely establishes a rebuttable presumption." The Hazle Court further stated:

[O]nce a plaintiff establishes a prima facie case of discrimination, the defendant has the opportunity to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case. The articulation requirement means that the defendant has the burden of producing evidence that its employment actions were taken for a legitimate, nondiscriminatory reason.... If the employer makes such an articulation, the presumption created by the McDonnell Douglas prima facie case drops away.
At that point, in order to survive a motion for summary disposition, the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is "sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff."... [A] plaintiff "must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was pretext for [unlawful] discrimination." [Id. at 464-466, 628 N.W.2d 515 (citations omitted).]
[10] Plaintiff testified that, along with her alleged twenty-five percent interest in MTD, Baergen held a fifty percent interest and Kleinhans held the remaining twenty-five percent.
[11] Plaintiff's response in the letter also references Baergen making changes, with plaintiff further stating: "You did it with Bob and with Bryan and now with me." The trial court latched on to this single comment in concluding that plaintiff was treated the same as other MTD employees. There is, however, no true context to the comment, or explanation what it meant. The documentary evidence does not reveal further exploration of the matter. We give the comment little, if any, weight.
[12] Defendants maintain that the complaint was silent regarding adverse actions and retaliatory acts relating to the MTD employment; therefore, no action should be permitted. A review of the complaint does in fact show, when considered in light of the documentary evidence, that the specific claims of adverse and retaliatory actions correlated with plaintiff's work for Clark. Nonetheless, there still remained sufficient general claims of adverse and retaliatory actions related to MTD. Moreover, the retaliatory actions related to plaintiff's employment with Clark can still form the basis for a retaliation claim against Baergen individually where he was a supervisor for Clark.
[13] In regard to respondeat superior and vicarious liability, the Chambers Court, after reviewing Champion and Radtke, concluded:

To summarize, an employer is strictly liable only for quid pro quo sexual harassment. In terms of the statute, this means that an agent of the employer must have used submission or rejection of unwelcome sexual conduct or communication "as a factor in decisions affecting ... employment." MCL 37.2103(i)(ii); MSA 3.548(103)(i)(ii). When the submission to or rejection of the unwelcome sexual conduct or communication has not been factored into an employment decision, but a hostile work environment has nevertheless been created because unwelcome sexual communication or conduct substantially interferes with an individual's employment, the violation can only be attributed to the employer if the employer failed to take prompt and adequate remedial action after having been reasonably put on notice of the harassment. Radtke, supra. [Chambers, supra at 313, 614 N.W.2d 910 (emphasis in original).]
[14] We opine that the trial court incorrectly attempted to draw a clean line of separation between MTD and Clark instead of looking at the overall picture and the overlapping nature of the companies as it related to the causes of action. Actions and communications that could be relegated to plaintiff's employment with Clark could nonetheless constitute circumstantial evidence to support a finding of a causal connection between protected activity and adverse employment actions by MTD, where Baergen was a central character in both companies. In the same vein, we respectfully disagree with the position taken in the partially concurring and partially dissenting opinion, asserting that the adverse employment action was directly and solely attributable to plaintiff's alleged rejection of Baergen's proposition. We decline to find, as a matter of law, that the alleged adverse employment action can definitively be tied solely to Baergen's proposition; any point of demarcation is much too clouded. This issue is for a jury to decide, especially considering that the evidence suggests that the severity of Baergen's alleged actions, including removing plaintiff as sales manager, occurred after the Fraser's complaints and closer in time to the complaints than the Baergen proposition. We further note that paragraphs 15 and 16 of the complaint alleged adverse employment actions flowing from the Fraser complaints.
[15] We acknowledge this Court's decision in Mitan v. Neiman Marcus, 240 Mich.App. 679, 681-682, 613 N.W.2d 415 (2000), in which the panel, after citing McLemore, concluded that the plaintiff's written complaints to a human resource director were not sufficient where the complaints spoke only of job discrimination and harassment without stating, implying, or raising the specter of a handicapper violation. The Court found further support for its decision in the plaintiff's deposition testimony, which indicated that she admitted to the human resource director that she was treated the same as everyone else. Id. at 682-683, 613 N.W.2d 415. The short opinion per curiam contains no discussion of background facts, so we cannot ascertain the nature of the handicap and the knowledge that others may have had of the particular handicap. We find here that the specter of a sexual harassment discrimination suit was raised or could be implied where a female employee complained to an attorney-executive of discrimination, harassment, and demeaning conduct and communication by a male boss. Further, plaintiff never conceded that she was not treated differently. Considering the language of McLemore, we conclude, while viewing the evidence in a light most favorable to plaintiff, that plaintiff, when speaking to Fraser, was engaged in protected activity under MCL 37.2701. Defendants' reliance on Barrett, supra, is misplaced because there the specter of gender discrimination could not be discovered or implied in that the plaintiff was male as was the employee whose actions plaintiff challenged, and where this Court found that the true nature of the CRA action was predicated on romantic jealousy over a mutual girlfriend. Id. at 319-322, 628 N.W.2d 63.
[16] In further support of our ruling, we direct attention to In re Rite Aid Corp. Securities Litigation, 139 F Supp 2d 649 (E.D.Pa., 2001), in which the federal district court found no basis for disqualification under comparable factual circumstances and ethics rules.